FILED
2026 Sep-30 PM 01:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

KAYLA RAMSEY, *as substitute party for Jaclyn Ramsey, deceased*

Plaintiff,

vs.

SOCIAL SECURITY ADMINISTRATION, COMMISSIONER,

Defendant.

Case No. 4:25-cv-01558-HNJ

# MEMORANDUM OPINION

Plaintiff Kayla Ramsey ("Kayla") seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding Claimant Jaclyn Ramsey's claim for a period of disability, disability insurance, and supplemental security income benefits. The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder. The Regulations define

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment. (Doc. 9).

"disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge ("ALJ"), works through a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at §§ 404.1520(c), 416.920(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00-114.02. *Id.* at §§ 404.1520(d), 416.920(d). If a claimant's

impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525, 416.920(a)(4)(iii), 416.925. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue*, 416 F. App'x 861, 862 (11th Cir. 2011) (citing 20 C.F.R. § 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.").

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work. 20

C.F.R. §§ 404.1512(b)(3), 416.912(b)(3), 404.1520(g), 416.920(g). If the claimant can perform other work, the evaluator will not find the claimant disabled. *See id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *see also* 20 C.F.R. §§ 404.1520(g), 416.920(g). If the claimant cannot perform other work, the evaluator will find the claimant disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'" *Parks ex rel. D.P. v. Comm'r, Soc. Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Indeed, "an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'" *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citing 42 U.S.C. § 405(g)). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ. *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. . . . Substantial evidence . . . is 'more than a mere scintilla,' . . . [and] means – and means only – 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'" *Biestek*, 587 U.S. at 103 (citations omitted). Therefore, substantial evidence exists even if the evidence preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

On April 30, 2018, Jaclyn Ramsey ("Ramsey") protectively filed applications for a period of disability, disability insurance, and supplemental social security benefits, alleging disability as of September 10, 2017. (Tr. 239-48). The Commissioner denied Ramsey's original application. (Tr. 51-92, 93-134). Ramsey filed a timely request for a hearing on November 21, 2018. (Tr. 176). An Administrative Law Judge ("ALJ"), Clarence Guthrie, held a hearing on February 11, 2020. (Tr. 32-50). ALJ Guthrie issued an opinion on February 27, 2020, denying Ramsey's application. (Tr. 12-26, 1615-29).

On March 20, 2020, Ramsey appealed ALJ Guthrie's decision. (Tr. 236-38, 1508). On August 12, 2020, the Appeals Council denied Ramsey's request for review. (Tr. 1-3, 1635-37). On September 28, 2020, Ramsey filed a civil action with this court, the United States District Court for the Northern District of Alabama, Middle Division, seeking review of ALJ Guthrie's February 2020 decision. (Tr. 1646). On June 6, 2022, this court issued a memorandum opinion and final judgment affirming the decision of the Commissioner. (Tr. 1641-60, 1661). On August 4, 2022, Ramsey filed an appeal to the Eleventh Circuit Court of Appeals. (Tr. 1662-63).

On appeal before the Eleventh Circuit,

> the Commissioner filed a consent motion . . . for vacatur and remand to the district court, citing "[Social Security Administration] discretion" and "the interests of justice." *Ramsey v. Social Security Administration, Commissioner*, No. 22-12582-FF (11th Cir. Nov. 17, 2022). The Commissioner state[d] that on remand, "the ALJ will be directed to offer the claimant the opportunity for a hearing; give further consideration to the medical source opinions and prior administrative medical findings pursuant to the provisions of 20 CFR 404.1520c and 416.920c; and give further consideration to [Ramsey's] maximum residual functional capacity." *Id.*

(Tr. 1666-67).

On December 1, 2022, the Eleventh Circuit granted the consent motion, vacated the June 6, 2022, opinion and remanded the case to this court with instructions to remand the matter to the Commissioner for further proceedings. (Tr. 1665). Pursuant to the Eleventh Circuit's order, this court reversed the Commissioner's decision to deny benefits and remanded the case to the Commissioner for further proceedings. (Tr. 1666-67). On November 14, 2023, the Appeals Council remanded the case to an ALJ "for further proceedings in accordance with the fourth sentence of section 205(g) of the Social Security Act." (Tr. 1698, 1696-97).

On April 18, 2024, ALJ Guthrie held a second hearing. (Tr. 1558-95). On July 24, 2024, the ALJ issued another unfavorable decision. (Tr. 1505-46).

Applying the five-step sequential process, the ALJ found at step one Ramsey did not engage in substantial gainful activity from September 10, 2017, through February 27, 2020, the alleged period of disability. (Tr. 1515). At step two, the ALJ found Ramsey manifested the severe impairments of degenerative disc disease, degenerative

joint disease of the right knee, coronary artery fistulas, mitral valve prolapse, ventricular tachycardia, migraines, anxiety disorder, and depressive disorder. (*Id.*). At step three, the ALJ found Ramsey's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 1516).

Next, the ALJ found Ramsey exhibited the residual functional capacity ("RFC") to perform

> sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she could occasionally climb ramps or stairs; she c[ould] never climb ladders, ropes, or scaffolds; she could occasionally balance, stoop, kneel, crouch, or crawl; she could occasionally be exposed to extreme cold, extreme heat, excessive vibration, excessive irritants such as fumes, odors, dust, and gases, poorly ventilated areas, chemicals as defined in the Selected Characteristics of Occupations of the [Dictionary of Occupational Titles ("DOT")]; she could never be exposed to workplace hazards such as moving mechanical parts and high, exposed places; she could understand, remember, and carry out simple instructions; she [could not] perform work requiring a specific production rate, such as assembly line work, or work that requires hourly quotas; she could tolerate occasional interaction with the public, and occasional interaction with coworkers and supervisors; she could deal with occasional changes in the work setting; she was limited to occupations that do not require commercial driving.

(Tr. 1526).

At step four, the ALJ determined Ramsey did not retain the ability to perform her past relevant work as a day worker (reported by Ramsey as self-employment in housekeeping). (Tr. 1542). However, at step five, the ALJ determined, considering Ramsey's age, education, work experience, and RFC, she could perform a significant

number of other jobs in the national economy, including lens inserter, eyeglass frame polisher, and envelope addresser. (Tr. 1543-44). Accordingly, the ALJ determined Ramsey did not suffer a disability, as defined by the Social Security Act, from September 10, 2017, through February 27, 2020. (Tr. 1545).

Ramsey filed written exceptions to the ALJ's decision and requested the Appeals Council review the unfavorable opinion. (Tr. 1826-57). On July 7, 2025, the Appeals Council denied Ramsey's request for review, rendering the ALJ's decision the Commissioner's final decision. (Tr. 1490-96). On or about April 13, 2025, Jaclyn Ramsey perished after battling Stage IV cervical cancer. (Doc. 1 at ¶5; doc. 14 at 8). Kayla Ramsey, proceeding as the substitute party for Jaclyn Ramsey, filed a complaint with this court on September 10, 2025. (Doc. 1).

While Jaclyn Ramsey litigated her appeals on her 2018 applications for disability, she filed another set of applications for a period of disability, disability insurance, and supplemental social security benefits on September 25, 2020, alleging disability as of February 28, 2020,[2] one day after ALJ Guthrie issued his initial decision on the 2018 applications. (Tr. 1511, 1671). The Commissioner denied Ramsey's 2020 claims initially on January 26, 2021, and upon reconsideration on March 2, 2022. (Tr. 1671). Ramsey filed a request for a hearing on April 13, 2022. (*Id.*). ALJ Emilie Kraft held a hearing on July 6, 2023. (*Id.*).

---

[2] Ramsey initially alleged an onset date of disability of February 25, 2020. (Tr. 1511, 1671). At a later hearing, Ramsey amended the alleged onset date to February 28, 2020. (Tr. 1511, 1673).

ALJ Kraft issued a partially favorable opinion on September 25, 2023, finding Ramsey became disabled on June 18, 2021, due to cervical cancer. (Tr. 1672, 1668-86).

> However, for the period of February 28, 2020[,] through June 17, 2021, [ALJ Kraft] considered [Ramsey's] medically determinable impairments and determined [Ramsey] could not perform past work, but considering her age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that [Ramsey] could have performed."

(Tr. 1511, 1671-86). Ramsey did not file a request for review of this decision; therefore, the decision became final and binding. (Tr. 1511); *see also* 20 C.F.R. §§ 404.987(a), 416.1487(a).

In its November 14, 2023, order remanding the case involving the 2018 applications to the ALJ, the Appeals Council addressed ALJ Kraft's 2023 decision:

> [Ramsey] filed a subsequent claim for disability benefits on September 25, 2020. The Administrative Law Judge found [Ramsey] disabled as of June 18, 2021. The Appeals Council neither affirms nor reopens this decision, which continues to be binding. This means that the decision will be subject to reopening and revision if additional development indicates that the conditions for reopening are met. Unless the decision is reopened and revised in accordance with applicable regulations, the period before the Administrative Law Judge will be limited to that period prior to June 18, 2021.

(Tr. 1699).

In his July 24, 2024, decision issued on remand, ALJ Guthrie considered reopening the 2023 decision, and he declined to do so. He explained his reasoning as follows:

> In considering the cited regulations, reopening and revising a determination or decision would require reopening the entire period

> considered within that determination or decision. As noted previously, [Ramsey] did not appeal the ALJ decision for her subsequent application. Moreover, I have reviewed the evidence and find that the ALJ's decision dated September 25, 2023, for [Ramsey's] subsequent application filed on September 25, 2020, adjudicating the period from February 28, 2020, is not reopened and revised because good cause is not established. New evidence has been submitted, but the evidence is not material, as it does not clearly show on its face that an error was made (20 CFR 404.988 *et seq.* and 416.1488 *et seq.*). Additionally, the provisions of Social Security Ruling 91-5p were considered and do not apply. Accordingly, [the] decision is final and binding regarding the period of February 28, 2020[,] forward, and I will consider the period from the alleged onset date, September 10, 2017[,] through February 27, 2020. I also note that the decisions for prior applications are not reopened and revised for the same reasons.

(Tr. 1512).

## ANALYSIS

In this appeal, Kayla argues ALJ Guthrie failed to consider evidence of Ramsey's cervical cancer prior to the June 18, 2021, diagnosis; failed to include any limitations in the RFC to account for the symptoms, not just the exacerbation, of Ramey's migraines; and relied on "clearly wrong" Vocational Expert ("VE") testimony to find Ramsey could perform a significant number of other jobs in the national economy. For the reasons discussed below, the undersigned concludes those contentions do not warrant reversal.

## I. The ALJ[3] Did Not Err When He Declined to Consider Limitations Attributed to Ramsey's Cervical Cancer Diagnosis.

### a. The ALJ's Finding That There Exists No Evidence of Cervical Cancer During the Period in Consideration Enjoys Substantial Evidentiary Support.

Kayla asserts the ALJ erred by failing to consider the effects of Ramsey's cervical cancer prior to June 18, 2021. Kayla contends the ALJ ruled Ramsey's "cervical cancer could not impact her eligibility for disability in the period before her diagnosis" on June 18, 2021. (Doc. 14 at 19). Kayla argues this "approach is plainly inconsistent with SSR 18-1p" which requires the Established Onset Date in disability claims to "be consistent with the nature of the impairments." (*Id.* at 18). Because "[c]ancers generally grow and develop over time[,]" Kayla claims the ALJ needed to consider potentially disabling impairments caused by the cancer before doctors diagnosed Ramsey. (*Id.*).

While Kayla accurately recites the requirements of SSR 18-1p, she mischaracterizes the nature of the ALJ's ruling. *See* 2018 WL 4945639, at *5 (2018). The ALJ did indeed refuse to consider impairments attributed to Ramsey's cervical cancer, but his refusal to address this did not extend to the period directly prior to Ramsey's diagnosis, that is, February 28, 2020, to June 17, 2021 (i.e., the period covered by ALJ Kraft's decision). (*See* Tr. 1516, 1540-41). Rather, ALJ Guthrie restricted his consideration to "the period from the alleged onset date, September 10, 2017[,] through

---

[3] As ALJ Guthrie authored the operative opinion in this case, the court will hereinafter refer to him simply as "the ALJ."

February 27, 2020," the period considered by ALJ Guthrie's first decision. (Tr. 1512).[4] He then found "there is no evidence of [the cervical cancer diagnosis] existing during the period in consideration." (Tr. 1516). Therefore, he concluded, stage IV cervical cancer "is not a medically determinable impairment that was not [sic] present from September 10, 2017[,] through February 27, 2020." (*Id.*; *see also* Tr. 1540 ("I also noted that [Dr. Oguntuyo] considered limitations existing prior to February 25, 2020, for impairments of malignant neoplasm of cervix status post radiation and chemotherapy and status nephrostomy among other impairments. [Ramsey's] cancer was not diagnosed until 2021 and there is no evidence of this condition existing before the cited date.")).

The court need not address whether substantial evidence would support a conclusion Ramsey's cervical cancer symptoms did not cause any medically determinable impairments in the period February 28, 2020, to June 17, 2021, as the ALJ did not make this determination. Therefore, the court declines to decide how SSR 18-1p might apply to this period. Rather, the court confines its review to the period from September 10, 2017, to February 27, 2020.

Substantial evidence supports the ALJ's determination Ramsey did not suffer medically determinable impairments related to cervical cancer prior to February 28,

---

[4] The court rejects Kayla's request to reverse the ALJ's decision not to reopen the period from February 28, 2020, to June 17, 2021, *infra*. Therefore, the court limits its analysis to the period the ALJ did consider (i.e., September 10, 2017, to February 27, 2020).

2020. When doctors diagnosed Ramsey with cervical cancer in June 2021, Ramsey complained of symptoms beginning approximately one year earlier, in the summer of 2020. (*See* Tr. 3231 ("presented with irregular menstrual bleeding and post coital bleeding during pandemic crisis (summer 2020) and was unable to get in for pelvic exam . . . symptoms worsened and then she developed pain in lower abdomen and back 6/2021 so she called for GYN appt"); *see also* Tr. 3079, 3140, 3154). During visits with her primary care physician, Dr. Oguntuyo, on February 10, 2020, and February 24, 2020, Ramsey did not mention any genitourinary symptoms, and he recorded the evaluation of the system as "within normal limits." (Tr. 2703, 2717, 3041, 3054). In addition, on March 25, 2018, a CT of Ramsey's abdomen and pelvis due to generalized abdominal pain revealed no abnormalities and no acute intraabdominal or intrapelvic disease. (Tr. 949). Finally, when testifying before the ALJ in both the February 2020 hearing and the April 2024 hearing, Ramsey did not identify cervical cancer, or any symptoms related to cervical cancer, as an impairment affecting her ability to function during the period September 10, 2017, to February 27, 2020, the time period the ALJ's decision covered. (*See* Tr. 39-44, 1565-80).

Kayla avers abdominal pain, low back pain, nausea, and vomiting represent symptoms that can occur with cervical cancer, and she points to Ramsey's treatment records indicating Ramsey regularly presented with these symptoms from October 2016 through February 2020 as evidence Ramsey experienced limitations due to cervical cancer during the relevant period. (Doc. 14 at 9-12, 20; Tr. 515, 517, 528, 530, 541,

543, 555, 557, 571, 578, 586, 588, 599, 638, 653, 669, 671, 684, 686, 699, 701, 709, 723, 737, 739, 754, 880, 884, 949, 989, 1012, 1028, 1044, 1060, 1076, 1092, 1108, 1124, 1140, 1156, 1172, 1188, 1204, 1234, 1266, 1282, 1298, 1314, 1330, 1454, 1457, 1473, 2347, 2696, 2698, 2700, 2703, 2719, 2735, 2987).

As to Kayla's assertion these symptoms evidenced cervical cancer prior to Ramsey's June 2021 diagnosis, the ALJ attributed the symptoms to Ramsey's other conditions: specifically, her history of recurrent urinary tract infections (UTIs) and medication side effects. (Tr. 1527 ("More recently, during the hearing held on April 18, 2024, she also endorsed impairment related symptoms such as . . . recurrent urinary tract infections with abdominal pain, nausea and vomiting since childhood . . . . She also endorsed medication side effects such as nausea [and] upset stomach . . . .")). Substantial evidence supports this determination. (Tr. 1573 ("Urinary tract infections has [sic] been a problem my whole life, even during my childhood and my teenage years, in school. Even -- that's the reason I had dropped out of school in 8th grade."), 1573-74 ("I get [UTIs] very often, and when I do, it's a lot of pain. I mean, I'm like, almost bent over double. I have to go to bed. It hurts to urinate, burns, blood, nausea and vomiting, fever, you name it."), 1574 (Ramsey testifying UTIs have been a problem for her from September 2017 through the date of the hearing, April 18, 2024), 943 (diagnosing UTI during emergency room visit on March 15, 2018)).

Furthermore, to the extent Kayla raises these symptoms to suggest they caused other functional limitations prior to February 28, 2020, which the ALJ neglected to

consider, the ALJ's decision refutes this claim. The ALJ considered these symptoms and the extent to which they resulted in functional impairments for Ramsey. (Tr. 1527). He determined:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. 1527). Whether the symptoms arose from recurrent UTIs and medication side effects, or conversely, the early effects of the later-diagnosed cervical cancer, would not affect the ALJ's conclusion regarding the resultant functional limitations therefrom.

Finally, applicable law does not require an ALJ to "discuss every piece of evidence if the ALJ's decision is not a broad rejection and there is enough for [the court] to conclude that the ALJ considered the claimant's medical condition as a whole." *Raper v. Comm'r of Soc. Sec.*, 89 F.4th 1261, 1277 (11th Cir.) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), *cert. denied sub nom. Raper v. O'Malley*, 145 S. Ct. 984 (2024); *Jamison v. Bowen*, 814 F.2d 585, 590 (11th Cir. 1987)). While the records Kayla identified may indicate symptoms of cervical cancer existing during the period considered, the ALJ's decision demonstrates he considered Ramsey's medical condition as a whole and determined Ramsey did not suffer medically determinable impairments related to cervical cancer prior to February 28, 2020, even if he did not specifically discuss the treatment records Kayla now references.

**b. The ALJ Did Not Err in Disqualifying the Barton Opinion.**

Kayla next argues the Barton Opinion represents "crucial new evidence that the ALJ possessed in 2024 but which the ALJ did not possess in 2023." (Doc. 14 at 20). Dr. Barton's medical opinion consists of a physical capacities form completed on February 9, 2024, indicating Ramsey's limitations. His opinion stated Ramsey could stand for three to four hours at a time; due to her medical conditions, she would "be lying down, sleeping, or sitting with legs propped up at waist level or above" for one hour in an eight-hour workday; she would "be off-task" 15% of an eight-hour workday; and she would fail to report to work three to five days in a 30-day period due to her physical symptoms. (Tr. 2775). Dr. Barton checked "yes" to the query whether "these limitations exist[ed] back [to] 9/10/2017," and he responded to a question about Ramsey's medication side effects with the notation, "History of cervical cancer with extensive treatment HX including urinary procedures." (*Id*.).

Kayla asserts the ALJ insufficiently evaluated the Barton Opinion because he "fail[ed] to address the supportability and consistency of the . . . [o]pinion as required by 20 C.F.R. § 404.1520c." (*Id.* at 21); *see also* 20 C.F.R. § 416.920(c).

Social Security regulations state an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). The ALJ must apply the same factors in the consideration of all medical opinions and administrative medical findings, rather

than affording specific evidentiary weight to any particular provider's opinion. *Id.*

Supportability and consistency constitute the most important factors in any evaluation, and the ALJ must explain the consideration of those factors. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2); *see also Dubose v. Comm'r of Soc. Sec.*, No. 24-13554, 2025 WL 2529598, at *5 (11th Cir. Sept. 3, 2025) ("[The claimant] is correct that for claims filed on or after March 27, 2017, regulations require administrative law judges to consider, and articulate how they considered, the 'supportability' and 'consistency' of relevant medical opinions."). Thus, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s)," and "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources . . . , the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2).

The ALJ also may consider the medical source's specialty and the relationship between the claimant and the medical source, including the length, purpose, and extent of the treatment relationship, and the frequency of examinations. *Id.* §§ 404.1520c(c)(3)-(5), 416.920c(c)(3)-(5). The ALJ "may" conclude an examining medical source will understand the claimant's impairments better than a medical source who only reviews evidence in the claimant's file. *Id.* §§ 404.1520c(c)(3)(v), 416.920c(c)(3)(v). The ALJ also "will consider other factors that tend to support or contradict a medical

opinion or prior administrative medical finding," including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* §§ 404.1520c(c)(5), 416.920c(c)(5).

Furthermore, "[a] claimant is allowed to present new evidence at each stage of the social security administrative process, including before the Appeals Council." *Ring v. Soc. Sec. Admin., Comm'r*, 728 F. App'x 966, 967 (11th Cir. 2018) (citing 20 C.F.R. § 404.900(b)); *see also* 20 C.F.R. § 416.1400(b). The ALJ must consider new evidence on rehearing if it "relates to the period on or before the date of the hearing decision." *Cf.* 20 C.F.R. §§ 404.970(a)(5), 416.1470(a)(5) (requiring the Appeals Council to review a case at a party's request if it "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision"); 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) (stating ALJ's "will assess [the claimant's] residual functional capacity based on all of the *relevant* medical and other evidence" (emphasis added)).

However, "[e]vidence is irrelevant and immaterial when it relates to a time period after the eligibility determination at issue." *Gordon v. Soc. Sec. Admin., Comm'r*, 625 F. App'x 512, 514 (11th Cir. 2015) (citing *Wilson v. Apfel*, 179 F.3d 1276, 1278-79 (11th Cir. 1999)); *see also Anderson v. Schweiker*, 651 F.2d 306, 310 n.3 (5th Cir. 1981) ("Because the examination that served as a basis for [the physician's] report took place after [the

claimant's] insured status had ended, . . . [the] report is relevant only for the light it sheds, if any, on [the claimant's] condition as it existed [during the pertinent period].");[5] *Grantham v. Colvin*, No. CV 312-046, 2013 WL 3804581, at *4 (S.D. Ga. July 18, 2013) ("[E]vidence, including opinion evidence from a treating physician, which occurs after the relevant time period and does not describe the claimant's condition during that period is properly rejected as irrelevant."); *Henderson v. Berryhill*, No. CV-417-225, 2019 WL 1179426, at *3 n.3 (S.D. Ga. Jan. 22, 2019) ("Post-date last insured records have little bearing on the disability determination unless [the claimant] demonstrates that the post-date evidence relates back to her condition prior to the expiration of her insured status. . . . In other words, only evidence directly bearing on [the claimant's] pre-expiration medically determinable impairments . . . should be considered." (citations omitted)), *report and recommendation adopted,* No. CV417-225, 2019 WL 1186854 (S.D. Ga. Mar. 12, 2019).

Nevertheless, "'[m]edical opinions based on treatment occurring after the date of the ALJ's decision may be chronologically relevant.'" *Howze v. Soc. Sec. Admin.*, No. 21-11066, 2022 WL 152236, at *2 (11th Cir. Jan. 18, 2022) (quoting *Washington v. Soc. Sec. Admin., Comm'r*, 806 F.3d 1317, 1322 (11th Cir. 2015) (per curiam)). In *Howze*, the Eleventh Circuit explained the standard for evaluating chronological relevance:

> In *Washington*, the claimant submitted to the Appeals Council a psychologist's evaluation and accompanying opinion about the degree of

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions decided prior to October 1, 1981.

> the claimant's mental limitations, which were prepared seven months after the ALJ's decision. *Id.* at 1319. We concluded that the psychologist's materials were chronologically relevant because: (1) the claimant described his mental symptoms during the relevant period to the psychologist, (2) the psychologist had reviewed the claimant's mental health treatment records from that period, and (3) there was no evidence of the claimant's mental decline since the ALJ's decision. *Id.* at 1322-23 (limiting its holding to "the specific circumstances of this case").
>
> But we have also held that the Appeals Council correctly declined to consider new medical records because the records were "about a later time" than the ALJ's decision, and, therefore, did not affect the decision about whether the claimant was disabled during the relevant period. *Hargress*[ *v. Soc. Sec. Admin., Comm'r*], 883 F.3d [1302,] 1309[ (11th Cir. 2018)]. In *Hargress*, we held that the new records were not chronologically relevant because nothing in them indicated that the doctor, who did not treat the claimant during the relevant period, had reviewed the appellant's medical records, or that the information in the new records related to the period at issue. *Id.* at 1309-10.

*Howze*, 2022 WL 152236, at *2.

Dr. Wade Barton issued his opinion, dated February 9, 2024, almost four years after February 27, 2020, which constitutes the end of the period under consideration. The ALJ addressed Dr. Barton's opinion and found it unpersuasive:

> I am not persuaded by this statement, as the limitations are based on a history of cervical cancer that was diagnosed in 2021 (Exhibits C33F, C48F, C60F, C62F-C69F, C71F-C74F, C79F, C80F, C82F, C83F, and C84F). Therefore, Dr. Barton did not treat the claimant during the period under consideration, September 10, 2017[,] through February 27, 2020.

(Tr. 1541). Although the ALJ does not explicitly refer to the opinion as chronologically irrelevant, the nature of his comments addresses this threshold inquiry and finds the opinion irrelevant for the period under consideration.

In *Hargress*, the Eleventh Circuit found new medical records chronologically

irrelevant because "nothing in these new medical records indicate[d] the doctors considered Hargress's past medical records or that the information in them relates to the period at issue." *Hargress*, 883 F.3d at 1309-10. The medical opinion in *Hargress* included a checked box indicating Hargress's limitations dated back to the period at issue, but the doctor issuing the opinion did not begin treating Hargress until after the period under consideration. *Id.* at 1310. Based on these facts, the court concluded, "the form did not relate to the period on or before the date of the ALJ's hearing decision." *Id.*; *see also Howze*, 2022 WL 152236, at *3 (finding a medical opinion completed eight months after the ALJ's decision not chronologically relevant because nothing indicated the doctor examined the claimant's past medical records to form the medical opinion despite the doctor treating the claimant during the relevant period).

Pursuant to the foregoing Eleventh Circuit precedent, the ALJ maintained no duty to address the supportability and consistency of Dr. Barton's opinion as it constituted chronologically irrelevant evidence due to its issuance almost four years after the period under consideration. Dr. Barton chronicled "[h]istory of cervical cancer with extensive treatment [history] including urinary procedures" as the only included reasoning for his opinion regarding Ramsey's limitations. (Tr. 2775). Nothing else on the check-box style form or in any other documents indicates Dr. Barton evaluated Ramsey's records from September 10, 2017, to February 27, 2020, the time period at issue.

Furthermore, as the court previously addressed, the ALJ determined Ramsey did

not possess any medically determinable impairments related to cervical cancer in the period under consideration. Therefore, Dr. Barton's limitations, to the extent they rely on Ramsey's subsequent diagnosis and treatment of cervical cancer, represent irrelevant evidence for the period September 10, 2017, to February 27, 2020. In addition, similar to the facts in *Hargress*, Ramsey's medical records indicate Dr. Barton did not begin treating Ramsey until January 2024, after the period at issue. (Tr. 4263-4391). Finally, although Dr. Barton checked "yes" to indicate "these limitations exist[ed] back [to] 9/10/17," (Tr. 2775), this alone remains insufficient to deem his opinion relevant to the period the ALJ considered. *See Hargress*, 883 F.3d at 1310 ("Hargress did submit to the Appeals Council a physical capacities form completed on August 7, 2015[,] in which Dr. Teschner checked a box that indicated that Hargress's limitations dated back to January 21, 2013. . . . Nevertheless, nothing in the form or any other documents indicated that Dr. Teschner evaluated Hargress's past medical records when forming that opinion.").

Because Dr. Barton's opinion does not represent chronologically relevant evidence for the period the ALJ considered, the ALJ did not err in failing to address the supportability and consistency of this opinion. *See Ingram v. O'Malley*, No. 7:23-cv-00653-LSC, 2024 WL 3700207, at *4 (N.D. Ala. Aug. 7, 2024) ("[The claimant] argues that the ALJ did not acknowledge this opinion and conducted no analysis of the supportability and consistency factors. . . . There was no error by the ALJ in specifically not referencing NP Elledge's September 2022 opinion. The ALJ does not have to

specifically reference medical opinions that are not within the pertinent period at issue and do not relate back to the claimant's condition as it existed during the pertinent period."); *Edwards v. Comm'r, Soc. Sec. Admin.*, No. 6:20-cv-00715-HNJ, 2021 WL 3667031, at *8-9 (N.D. Ala. Aug. 18, 2021) (concluding no reversible error manifests from the ALJ's failure to consider medical records which did not specifically relate back to the period at issue); *Colclough v. Saul*, No. 3:19-cv-70-WC, 2020 WL 4429580, at *15 (M.D. Ala. July 31, 2020) (finding the ALJ bore no duty to address a medical source statement that "expressed no opinion about Plaintiff's condition during the relevant period and offered a diagnosis that could not have even existed during the relevant period"); *Shannon v. Berryhill*, No. CV417-041, 2019 WL 413527, at *4 (S.D. Ga. Feb. 1, 2019) (opining because the ALJ bore no duty to specifically reference each piece of evidence in the record, "the fact that the ALJ did not specifically mention each opinion that was rendered post-date last insured [did] not require a remand on that ground."); *Sutton v. Acting Comm'r of the Soc. Sec. Admin.*, No. 3:16-cv-886-J-MCR, 2017 WL 11026047, at *7-8 (M.D. Fla. Aug. 29, 2017) (holding even if the ALJ erred by failing to consider records postdating the claimant's date last insured, any such error remained harmless because the records did not relate to the pertinent period).

**c. ALJ Guthrie Properly Restricted His Consideration to September 10, 2017, Through February 27, 2020, the Period Not Covered by ALJ Kraft's Subsequent Partially Favorable Decision.**

Kayla argues the ALJ improperly failed to reopen consideration of Ramsey's claim for the period post-February 28, 2020, to June 17, 2021. Kayla does not prevail

on her contentions given the prevailing legal principles.

As an initial matter, the court does not have jurisdiction to review the Commissioner's unfavorable decision on Ramsey's claim for benefits for the period February 28, 2020, to June 17, 2021. The doctrine of administrative *res judicata* applies when the Commissioner has "made a previous determination or decision . . . about [a claimant's] rights on the same facts and on the same issue or issues, and this previous determination or decision has become final by either administrative or judicial action . . . ." 20 C.F.R. §§ 404.957(c)(1), 416.1457(c)(1); *see also Atkins v. Comm'r, Soc. Sec. Admin.*, 596 F. App'x 864, 868 (11th Cir. 2015).

Ramsey did not file a request for review of ALJ Kraft's 2023 decision; "[t]herefore, the ALJ decision issued on September 25, 2023, adjudicating the period from February 28, 2020, forward, became final and binding." (Tr. 1511); *see also* 20 C.F.R. §§ 404.987(a), 416.1487(a) ("Generally, if [the claimant is] dissatisfied with a determination or decision made in the administrative review process, but do[es] not request further review within the stated time period, [the claimant] lose[s their] right to further review and that determination or decision becomes final."). ALJ Kraft's 2023 decision determined Ramsey "was not disabled prior to June 18, 2021, but became disabled on that date." (Tr. 1672). Said differently, the decision found Ramsey did not qualify for disability benefits from February 28, 2020, the date she alleged onset of disability in her September 2020 application, to June 17, 2021. "The Appeals Council neither affirm[ed] nor reopen[ed] the decision, which continues to be binding." (Tr.

1699).

ALJ Guthrie implicitly invoked the doctrine of *res judicata* in analyzing his authority to consider whether Ramsey suffered from a disability during the period February 28, 2020, to June 17, 2021. (Tr. 1511-12). He determined he could not consider this period without reopening or revising ALJ Kraft's decision, which "would require reopening the entire period considered within that determination or decision." (Tr. 1512). He further decided against reopening or revising ALJ Kraft's 2023 decision and accordingly limited his consideration on remand to "the period from the alleged onset date, September 10, 2017[,] through February 27, 2020." (*Id.*).

Kayla does not contest ALJ Guthrie would need to reopen ALJ Kraft's decision to consider "the prior adjudicated period of February 28, 2020[,] to June 17, 2021 . . . ." (Doc. 14 at 16-17, 23-24). Rather, she contends ALJ Guthrie improperly failed to reopen ALJ Kraft's opinion to consider that period. (*See id.* at 26 ("The ALJ applies t[he] wrong legal standard when considering whether there is good cause to reopen the February 28, 2020[,] to June 17, 2021[,] period. Had the ALJ applied the correct standard, reopening would have been required.")). The Commissioner asserts this court lacks "jurisdiction to review the ALJ's decision not to reopen the September 2023 decision." (Doc. 17 at 12).

"A district court's jurisdiction to review claims arising under the Social Security Act is limited by 42 U.S.C. § 405(g), which permits review only 'after any final decision of the Commissioner of Social Security made after a hearing.'" *Bello v. Comm'r of Soc.*

*Sec.*, 460 F. App'x 837, 839 (11th Cir. 2012) (citing *Cash v. Barnhart*, 327 F.3d 1252, 1255 (11th Cir. 2003)). The regulations define a final decision as "an initial determination that a claimant has pursued through all steps of the administrative review process, including an initial determination, a reconsideration determination, a hearing decision by an ALJ and discretionary review by the Appeals Council." *Id.* at 839-40 (citing 20 C.F.R. § 404.900(a)(1)(5)); *see also* 20 C.F.R. § 416.1400(a)(1)(5).

"As a general matter, district courts do not have jurisdiction over the Commissioner's refusal to reopen a claim, since such a refusal is not a 'final decision' with the meaning of § 405(g)." *Cash*, 327 F.3d at 1256 (citing *Califano v. Sanders*, 430 U.S. 99, 107-09 (1977)). The Supreme Court likewise determined 42 U.S.C. § 405(g) does not "authorize judicial review of a final decision of the Secretary not to reopen a claim of benefits." *Califano*, 430 U.S. at 107. The Supreme Court reasoned as follows:

> The pertinent part of [42 U.S.C. § 405(g)] provides:
>
> "Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days . . . ." . . .
>
> This provision clearly limits judicial review to a particular type of agency action, a "final decision of the Secretary made after a hearing". But a petition to reopen a prior final decision may be denied without a hearing as provided in § 205(b), 42 U.S.C. § 405(b) (1970 ed., Supp. V); see *Cappadora v. Celebrezze*, 356 F.2d 1, 4 (2d Cir. 1966); *Ortego v. Weinberger*, 516 F.2d 1005, 1007 (5th Cir. 1975). Indeed, the opportunity to reopen final decisions and any hearing convened to determine the propriety of such action are afforded by the Secretary's regulations and not by the Social Security Act. Moreover, an interpretation that would allow a claimant judicial review simply by filing and being denied a petition to reopen his

> claim would frustrate the congressional purpose, plainly evidenced in § 205(g), to impose a 60-day limitation upon judicial review of the Secretary's final decision on the initial claim for benefits. 20 C.F.R. § 404.951 (1976). Congress' determination so to limit judicial review to the original decision denying benefits is a policy choice obviously designed to forestall repetitive or belated litigation of stale eligibility claims. Our duty, of course, is to respect that choice.

*Califano*, 430 U.S. at 108 (cleaned up); *see also* 20 C.F.R. § 404.903 ("Administrative actions that are not initial determinations may be reviewed by [the Social Security Administration], but they are not subject to the administrative review process provided by this subpart, and they are not subject to judicial review. These actions include, but are not limited to, an action— . . . (l) Denying [the claimant's] request to reopen a determination or a decision . . . ."); 20 C.F.R. § 416.1403(a)(5).

Nevertheless, a court sustains "jurisdiction to review the Secretary's refusal to reopen a prior decision if (1) the claimant raises a colorable constitutional claim, or (2) the record demonstrates that there has been an actual reexamination of the merits of a prior administrative decision." *Wolfe v. Chater*, 86 F.3d 1072, 1078 (11th Cir. 1996) (citing *Jones v. Dep't of Health & Hum. Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991) (per curiam)); *see also Bello*, 460 F. App'x at 840 ("As such, federal courts lack subject matter jurisdiction to review a denial of a request to reopen except where: (1) the claimant raises a colorable constitutional claim, or (2) the Commissioner *de facto* reopens and reconsiders the merits of the prior administrative determination or decision." (citing *Califano*, 430 U.S. at 108-09; *Cash*, 327 F.3d at 1256)). Kayla does not lodge a constitutional challenge permitting judicial review of the ALJ's failure to reopen Ramsey's claim.

Regarding the second exception, "a final decision by the Secretary will be deemed reopened if it is 'reconsidered on the merits to any extent and at any administrative level.'" *Passopulos v. Sullivan*, 976 F.2d 642, 646 (11th Cir. 1992) (citing *Cherry v. Heckler*, 760 F.2d 1186, 1189 (11th Cir. 1985), *superseded on other ground by* 20 C.F.R. § 404.1520(a) (1992); *Hall v. Bowen*, 840 F.2d 777, 778 (11th Cir. 1987)); *see also Cash*, 327 F.3d at 1257 ("[W]e must look to what the ALJ and the Appeals Council did to determine if a reopening occurred and not to the initial interim decisions at the lower agency levels."). Such a constructive reopening does not occur if the ALJ merely evaluates "how newly presented evidence relates back to the prior application in order to determine whether to reopen the case pursuant to 20 C.F.R. §§ 404.988, 404.989." *Passopulos*, 976 F.2d at 646 (citing *Hall*, 840 F.2d at 778; *Cherry*, 760 F.2d at 1189); *see also* 29 C.F.R. §§ 416.1488, 416.1489. Stated differently, "an ALJ does not reopen a prior final decision when the ALJ evaluates evidence presented in support of the original application solely to make a reasoned determination of its *res judicata* effect on the second application." *Passopulos*, 976 F.2d at 646 (citing *Cherry*, 760 F.2d at 1189). In contrast, constructive reopening occurs when "the ALJ does not apply *res judicata* and bases an ultimate determination on a review of the record in the prior application." *Id.* (citing *Cherry*, 760 F.2d at 1189 (in turn citing with approval *Brown v. Heckler*, 565 F. Supp. 72, 74 (E.D. Wis. 1983))).

The Eleventh Circuit explained the purpose of this exception:

> In applying the . . . exception, "our aim [has been] to demand compliance with the Secretary's regulations on reopening." *Passopulos v. Sullivan*, 976 F.2d 642, 647 (11th Cir. 1992). Thus, we have exercised jurisdiction where

> ALJs "disregard[ed] the regulations and declare[d] that a reopening ha[d] not occurred when a reopening ha[d], in fact, occurred." *Id.* To determine if a reopening occurred, "we must look to what the ALJ and the Appeals Council did," since jurisdiction exists "to review only the Commissioner's final decision." *Cash*, 327 F.3d at 1257. If a decision is reopened, "we have jurisdiction to review the prior decision to the extent that it has been reopened." *Wolfe*, 86 F.3d at 1079.

*Hunter v. Comm'r of Soc. Sec.*, No. 22-13102, 2023 WL 5605841, at *2 (11th Cir. Aug. 30, 2023).

Hence, "reopening of a case is an extraordinary measure, affording the opportunity of a second excursion through the decision making process." *Bloodsworth*, 703 F.2d at 1238. "Because the reopening procedure is in the nature of a bonus opportunity, a greater degree of judicial deference is due to discretionary denials by the administrative agency than is appropriate where judicial review exists as a matter of statutory right." *Id.*; *see also Passopulos*, 976 F.2d at 647 ("The significance of the Secretary's intent in promulgating the reopening regulations cannot be underemphasized in this matter. Again, the Secretary's regulations afford the opportunity to reopen a final decision in a social security disability case, not the Social Security Act. . . . Therefore, if this court extends the bonus remedial opportunity beyond its intended boundaries, the court runs the risk of forcing the Secretary to repeal the reopening regulations entirely in order to avoid the burdensome intrusion on the finality of its decisions." (citing *Califano*, 430 U.S. at 108)).

As an initial matter, Kayla does not directly contend ALJ Guthrie constructively reopened ALJ Kraft's 2023 decision. (*See* doc. 14 at 23-26). And the record portrays

neither the Appeals Council nor ALJ Guthrie constructively reopened ALJ Kraft's decision. That is, the record demonstrates neither adjudicatory entity "'actually reexamined' the merits of the closed disability application in a way that matters for [this court's] jurisdiction." *Hunter*, 2023 WL 5605841, at *3 (citing *Hall*, 840 F.2d at 778).

The Appeals Council may decide on its own motion to review any decision or dismissal within sixty days of its issuance. 20 C.F.R. §§ 404.969(a), 416.1469(a); *see also Butterworth v. Bowen*, 796 F.2d 1379 (11th Cir. 1986). The Appeals Council issued its order remanding the case concerning the 2018 applications on November 14, 2023, fifty days after ALJ Kraft issued her partially favorable decision on September 25, 2023. (Tr. 1698-1700, 1671-84). Nevertheless, in its order remanding the case concerning the 2018 applications, the Appeals Council expressly stated it neither affirmed nor reopened ALJ Kraft's 2023 decision. (Tr. 1699). Despite that assertion, the Council remarked that "[u]nless the [2023] decision is reopened and revised in accordance with applicable regulations, the period before the Administrative Law Judge will be limited to that period *prior to June 18, 2021*." (*Id.* (emphasis added)). The Ninth Circuit ruled that nearly identical language in an Appeals Council remand order did not reopen a claim litigated while a prior claim progressed through the appeals process. *See Nevin v. Colvin*, 125 F.4th 1297, 1300 (9th Cir. 2025) ("It is clear from the text of the Appeals Council's order that the Council did not reopen Nevin's award of benefits on her second application. The Council stated explicitly that it 'neither affirm[ed] nor reopen[ed]' that determination."). In addition, the Appeals Council did not review ALJ Kraft's decision

on the merits to any extent. Therefore, the Appeals Council did not constructively reopen ALJ Kraft's decision.

Furthermore, ALJ Guthrie did not constructively reopen ALJ Kraft's decision. Although he considered whether he should reopen the 2023 decision, he ultimately determined "the ALJ's decision dated September 25, 2023, for the claimant's subsequent application filed on September 25, 2020, adjudicating the period from February 28, 2020, is not reopened and revised because good cause is not established." (Tr. 1512; *see also id.* at 1511-12 (citing 20 C.F.R. §§ 404.987-89, 416.1487-89; Hearings, Appeals, & Litig. L. Manual ("HALLEX") § I-2-9-5A; SSR 91-5p, 1991 WL 208067 (1991))). He also did not review ALJ Kraft's decision on the merits; he limited his consideration to "the period from the alleged onset date, September 20, 2017[,] through February 27, 2020." (Tr. 1512). Thus, ALJ Guthrie did not constructively reopen the 2023 decision; rather, to the extent he considered any evidence related to ALJ Kraft's decision, he "evaluate[d] evidence presented in support of the [2020] application[s] solely to make a reasoned determination of its *res judicata* effect on the [remanded] application[s]." *Passopulos*, 976 F.2d at 646.

Kayla's request for judicial review of ALJ's Guthrie's failure to reopen ALJ Kraft's decision does not rely on a colorable constitutional claim or a constructive reopening, the two recognized exceptions which allow district courts to review such a denial. Thus, this court does not possess subject matter jurisdiction to review ALJ Guthrie's refusal.

Nevertheless, Kayla asserts this court "should reverse and remand the ALJ's consideration of whether to reopen the period of February 28, 2020[,] through June 17, 2021[, and] . . . should demand the SSA comply with its own regulations." (Doc. 14 at 24). She argues ALJ Guthrie applied the wrong legal standard to the issue, and "[h]ad the ALJ applied the correct standard, reopening would have been required." (*Id.* at 26).

Even if the court held it possessed subject matter jurisdiction to review the ALJ's failure to reopen the claims for the period February 28, 2020, to June 17, 2021, the court would need to assess whether the ALJ applied the wrong standard and whether that error resulted in prejudice. The Eleventh Circuit has "held that an agency's violation of its own governing rules must result in prejudice before [a court] will remand to the agency for compliance." *Carroll v. Soc. Sec. Admin., Comm'r*, 453 F. App'x 889, 892 (11th Cir. 2011) (citing *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. Unit A Sept. 1981) (per curiam)). The undersigned does not find the ALJ's misstatement of the good cause standard resulted in prejudice necessitating a remand.

Good cause for reopening a prior disability determination presents as follows:

> (a) We will find that there is good cause to reopen a determination or decision if—
>
> > (1) New and material evidence is furnished;
> > (2) A clerical error in the computation or recomputation of benefits was made; *or*
> > (3) The evidence that was considered in making the determination or decision clearly shows on its face that an error was made.
>
> (b) We will not find good cause to reopen your case if the only reason for reopening is a change of legal interpretation or administrative ruling upon which the determination or decision was made.

20 C.F.R. § 404.989 (emphasis added); *see also* 20 C.F.R. § 416.1489.

In considering whether to reopen ALJ Kraft's decision, ALJ Guthrie conflated the provisions in (a)(1) and (a)(3). He found good cause did not exist to reopen ALJ Kraft's opinion because "[n]ew evidence has been submitted, but the evidence is not material, as it does not clearly show on its face that an error was made." (Tr. 1512 (citing 20 C.F.R. §§ 404.988 *et seq.*, 416.1488 *et seq.*)).

As revealed, ALJ Guthrie erred in defining material evidence as evidence that "clearly shows on its face that an error was made." *Id.* Rather, "[t]o be material, evidence must be both relevant and probative." *Lindsey v. Comm'r of Soc. Sec.*, 741 F. App'x 705, 710 (11th Cir. 2018) (citing *Keeton v. Dep't of Health & Hum. Servs.*, 21 F.3d 1064, 1068 (11th Cir. 1994)). "[E]vidence is material [if] . . . there is a reasonable possibility that it would change the administrative result." *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987) (citations omitted); *see also Lindsey*, 741 F. App'x at 710 (holding material evidence must possess chronological relevance and exhibit a reasonable possibility of changing the administrative result).

Nevertheless, there ensued no prejudice from the error because the Barton Opinion remains insufficient to demonstrate good cause for reopening. A medical opinion constitutes "new" evidence if the administrative record does not contain the opinion, such as when a doctor provided the opinion after the ALJ rendered their decision. *See Magill v. Comm'r of Soc. Sec.*, 147 F. App'x 92, 95 (11th Cir. 2005); *cf. Vega v. Comm'r of Soc. Sec.*, 265 F.3d 1214, 1218-19 (11th Cir. 2001). Furthermore, as discussed,

"[t]o be material, evidence must be both relevant and probative." *Lindsey*, 741 F. App'x at 710 (citing *Keeton*, 21 F.3d at 1068). The evidence "must be chronologically relevant, meaning it must relate to the period" under consideration, and "there must be a reasonable possibility that it would change the administrative result." *Id.* (citing *Falge v. Apfel*, 150 F.3d 1320, 1323 (11th Cir. 1998); 20 C.F.R. §§ 404.970(b), 416.1470(b); *Washington*, 806 F.3d at 1320).

The Barton Opinion represents new evidence, as Dr. Barton issued his medical opinion on February 9, 2024, several months after ALJ Kraft issued her opinion on September 20, 2023. However, for the same reasons the court already explained previously, the Barton Opinion does not bear chronological relevance to the time period February 28, 2020, to June 17, 2021.

The records do not reflect Dr. Barton began treating Ramsey until January 2024, over two years after the end of the claim period ALJ Guthrie declined to reopen. (Tr. 4092). By the time Dr. Barton became involved in Ramsey's medical care, her cervical cancer had progressed significantly, metastasizing to her lungs and rib bones. (Tr. 4076 (radiology biopsy procedure report noting mass in left upper lobe of lung invading the left first rib), 4089 (indicating August 2023 PET scan showing lung lesion later biopsied as proven metastasis), 4148 (August 21, 2023, follow up note stating "Lung Mass is worsening. Believed to have metastase[s] from Ca Cervix, Awaiting Lung Biopsy")). None of the records signed by Dr. Barton, or even mentioning Dr. Barton, indicate he examined Ramsey's medical records for the time period February 28, 2020, to June 17,

2021. (Tr. 2187-88, 2190, 2775, 4092, 4263-67, 4282, 4287, 4296, 4311-12, 4321, 4340, 4356). In addition, despite Dr. Barton's checked box on the physical capacities form indicating "the limitations exist[ed] back [to] 9/10/17," none of his treatment records reflect the limitations related back to the period at issue or discussed conditions existing during that period. (Tr. 2775).

Therefore, Dr. Barton's opinion bears no more chronological relevance to the period February 28, 2020, to June 17, 2021, than it does to the period September 10, 2017, to February 27, 2020. *See Hargress*, 883 F.3d at 1310 (holding an opinion with a checked box indicating it related back to the period at issue chronologically irrelevant when a physician who did not treat the claimant during the relevant time authored the opinion and it contained no further indication the physician evaluated the claimant's past medical records when forming the opinion); *Howze*, 2022 WL 152236, at *3 (finding a medical opinion from a treating physician chronologically irrelevant because nothing indicated the doctor reviewed the claimant's medical records to form the opinion).

Furthermore, the records reflect Ramsey's condition worsened considerably by January 2024, when the records indicate Dr. Barton first became involved in Ramsey's medical care. Therefore, to the extent Dr. Barton's opinion relates to the time period he oversaw Ramsey's treatment, his opinion does not bear relevance to Ramsey's disability status in the period February 28, 2020, to June 17, 2021.

The assessment of the newly-submitted Barton Opinion may end with a finding of chronological irrelevance, yet the evidence also presents no reasonable probability of

changing the outcome of the disability decision.[6] The few treatment records referring to or signed by Dr. Barton do not contain support for Ramsey possessing disabling limitations prior to June 18, 2021.[7] Nothing in the record indicates Dr. Barton's assessed limitations dated back to February 28, 2020, much less September 10, 2017. Rather, the only reasoning in the record for Dr. Barton's opinion consists of the statement he included on the physical capacities form: "History of cervical cancer with extensive treatment [history] including urinary procedures." (Tr. 2775).

Considering the significant progression of Ramsey's cancer by the time Dr.

---

[6] The Barton Opinion consists of a "check-box" form. (Tr. 2775). Social Security regulations require an ALJ to assess the persuasiveness of a medical opinion based upon the relevancy of the "objective medical evidence and supporting explanations presented by a medical source" to support the opinion. 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). In 2019, the Eleventh Circuit declared an ALJ should not discount a physician's opinion solely based upon the format in which the physician expresses the opinion. *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1262 (11th Cir. 2019) ("The most that can be said in criticism of the questionnaires' format is that they used a 'check box' format with limited space for explanation of the assessments. But that is not a basis, in and of itself, to discount them as conclusory."). Rather, the ALJ should evaluate a physician's "answers to the questionnaires in light of their treatment notes." *Id.*

The Eleventh Circuit decided *Schink* under the now-defunct rule requiring an ALJ to afford deference to opinions of a claimant's treating physician, and the court's research revealed no definitive answer whether the Eleventh Circuit's statements about the summary nature of a physician's assessment should apply under the revised regulations governing opinion evidence. This court need not reach that determination today, as considering Dr. Barton's check-box statements in the context of his treatment notes does not undermine the court's conclusion Dr. Barton's opinion presents no reasonable probability of changing the outcome of the disability decision.

[7] In fact, the court can easily summarize the treatment records relating to Dr. Barton's care. The majority of these records consist of home health orders provided for Ramsey from January 24, 2024, to March 20, 2024. (Tr. 4092, 4263-67, 4282, 4296, 4311-12, 4321, 4340, 4356). Dr. Barton signed all of these records on March 28, 2024, up to two months after the home health care nurse originally entered the orders. The records also indicate Dr. Barton proscribed Ramsey medication for pain three times during this period. (Tr. 2187-88, 2190). Apart from these two categories, the only other treatment records the court located relating to Dr. Barton include a discharge note stating Ramsey "will follow up with Dr. Barton in clinic," (Tr. 4092), and a home health visit summary, "SN CALED [sic] UAB DR BARTON AND LEFT A MESSAGE," regarding a urine culture for a possible UTI, (Tr. 4287).

Barton formed this opinion, the absence of cancer treatments for Ramsey prior to her initial diagnosis of cervical cancer on June 18, 2021, and the lack of evidence demonstrating Dr. Barton reviewed Ramsey's prior treatment records for the period February 28, 2020, to June 17, 2021, his opinion does not depict a reasonable probability it would change the ALJ's decision.

## II. Substantial Evidence Supported the ALJ's Residual Functional Capacity Finding in Relation to Ramsey's Migraines.

Kayla argues the ALJ's residual functional capacity finding lacks substantial evidentiary report because "the ALJ did not include any limitation in the RFC to account for the symptoms of Ms. Ramsey's migraines – he only included limitations to prevent exacerbation (i.e., increased frequency and/or intensity) of those symptoms." (Doc. 14 at 26). In essence, Kayla contends the ALJ failed to prescribe more limitations for Ramsey's RFC vis-à-vis the migraine impairment. Kayla errs in this regard, as substantial evidence supports the ALJ's RFC restrictions vis-à-vis Ramsey's migraine impairment.

As previously discussed, at step four of the sequential analysis the ALJ formulates a claimant's RFC by assessing the claimant's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. §§ 404.1545(a)(4), 416.945(a)(4). The claimant's RFC represents "the most [the claimant] can still do despite [their] limitations." *Id.* at §§ 404.1545(a)(1), 416.945(a)(1). Assessing a claimant's RFC lies within the exclusive province of the ALJ. *See id.* at §§ 404.1527(d)(2), 416.927(d)(2)

("[T]he final responsibility for deciding [a claimant's RFC] is reserved to the Commissioner."); *id.* at §§ 404.1546(c), 416.946(c) ("[T]he administrative law judge . . . is responsible for assessing [a claimant's] residual functional capacity."); *Oates v. Berryhill*, No. CA 17-0130-MU, 2018 WL 1579475, at *8 (S.D. Ala. Mar. 30, 2018) ("The responsibility for making the residual functional capacity determination rests with the ALJ."); *Del Rio v. Berryhill*, No. 3:16-CV-00489-RFC, 2017 WL 2656273, at *8 (W.D. Tex. June 20, 2017) ("The ALJ has the sole responsibility of determining Plaintiff's RFC . . . .").

The ALJ must base its decision on all relevant evidence in the record, including medical history; medical signs and laboratory findings; the effect of treatments, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, and side effects of medication); daily activities; lay evidence; recorded observations; and medical source statements. *See* SSR 96-8p, 1996 WL 374184, at *5 (1996); 20 C.F.R. § 404.1545(a)(3).

Relatedly, when a claimant attempts to establish disability through her own testimony of pain or other subjective symptoms,

> [she] must satisfy two parts of a three-part test by showing: "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain."

*Zuba-Ingram v. Comm'r of Soc. Sec.*, 600 F. App'x 650, 656 (11th Cir. 2015) (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam)). A claimant's testimony

coupled with evidence that meets the pain standard "is itself sufficient to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citations omitted).

Social Security Ruling ("SSR") 16-3p establishes an ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file." SSR 16-3p, 2017 WL 5180304, *7 (Oct. 25, 2017). An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety of factors, including: the claimant's daily activities; symptom location; duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms. *See* C.F.R. § 404.1529(c)(3), (4).

SSR 16-3p also clarifies the ALJ's burden when discrediting a claimant's subjective symptoms: "[I]t is not sufficient . . . to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough . . . simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any

subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." 2017 WL 5180304 at *10; *see also Wilson*, 284 F.3d at 1225 (If an ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so."); *Malak v. Comm'r of Soc. Sec.*, 131 F.4th 1280, 1287 (11th Cir. 2025) ("If an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding." (citing *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995))). "The credibility determination must be sufficient to enable to the court to conclude that the ALJ considered the claimant's medical condition as a whole." *Parten v. Comm'r, Soc. Sec. Admin.*, No. 2:24-cv-00381-ACA, 2025 WL 2810008, at *9 (N.D. Ala. Sept. 30, 2025) (quoting *Dyer*, 395 F.3d at 1210) (cleaned up).

In the first hearing before ALJ Guthrie on February 11, 2020, Ramsey testified regarding her diagnosis of migraines. (Tr. 39-40). She had suffered a migraine for seven days leading up to the hearing, and she continued to suffer the migraine during the hearing. (Tr. 40 ("I have migraine headaches. I've had one this – one right now as we speak. I've had it for the last seven days and I can't get rid of it.")). On "days [she] ha[s] migraines . . . [she] can't hardly do anything." (Tr. 43). In his 2020 decision, the ALJ did not find Ramsey's migraines constituted a severe medically determinable impairment. (Tr. 1569 ("In 2020, I did not find migraines severe. That went to District Court and back, . . . and there was [sic] no issues with not finding migraines severe.");

*see also* Tr. 17-19).[8]

In the second hearing before ALJ Guthrie on April 18, 2024, Ramsey again testified to migraines she suffered during the time period under consideration. (Tr. 1568-71). She experienced headaches from September 2017 through the date of the hearing. (Tr. 1568, 1570-71). She "struggle[d] with migraine headaches several times a week – several days a week." (Tr. 1568). When asked how she copes with the migraines, Ramsey stated "the medicine does not help, and it . . . makes [her] sick to [her] stomach[,]" so she "just go[es] to [her] room, lay[s] down with a cold rag on [her] head, quiet, and . . . sleep[s] for hours, sometimes days, it takes it to go away." (Tr. 1569). During her testimony, Ramsey also acknowledged treating the migraines with Botox injections, Aimovig injections, and Ubrelvy pills, although she did not indicate when physicians began to provide her with each treatment. (Tr. 1568).

---

[8] In the 2020 decision, the ALJ described Ramsey's migraines as follows:

> The claimant has been diagnosed with migraine headaches and treated with medications (Exhibits CF and CF). However, her treatment records do not satisfy the criteria set out in SSR 19-4p for finding that these headaches are medically determinable. SSR 19-4p states that Social Security will consider the following combination of findings, which must be reported by an approved medical source: A diagnosis of primary headache disorder from an approved medical source after alternative medical and psychiatric causes have been excluded; observation and detailed description of a typical headache event by an approved medical source or observation by third party and documentation by an approved medical source; remarkable or unremarkable findings on laboratory tests; and response to treatment. The claimant's treatment records do not show exclusion of alternative causes, a detailed description of a typical headache, or migraine-related laboratory testing. Therefore, the claimant's migraines are not medically determinable.

(Tr. 18-19).

In his 2024 opinion, the ALJ determined Ramsey suffered from a number of severe medically determinable impairments, including migraines. (Tr. 1515). Nevertheless, the ALJ concluded "the claimant's statements concerning the intensity, persistence and limiting effects of [the alleged] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ." (Tr. 1527). Importantly, the ALJ held "the evidence does not fully support the claimant was as limited as alleged during this period. Rather, the evidence supports that the claimant retained the residual functional capacity for a sedentary exertion with additional limitations . . . ." (Tr. 1528).

The ALJ addressed Ramsey's "longstanding history of treatment for headache[s] diagnosed as intractable common migraine" in his consideration of Ramsey's entire medical record. (Tr. 1531). He determined:

> The claimant also has a longstanding history of treatment for headache diagnosed as intractable common migraine, with negative workup such as normal electroencephalogram and imaging studies of the brain (Exhibits C34F and C39F). While she has been unresponsive to multiple preventative medication[s], the relevant examination findings have remained entirely normal despite the claimant's allegations of frequent migraine headaches. Specifically, her cranial nerve function, eye movements, balance, gait, memory, cognition, and attention have all remained unaffected (Exhibit C3F-C5F, C7F-C8F, C26F, C29F, C39F, C40F-C44F, C46F, and C56F). She initially reported no improvement with Botox, but subsequent progress notes show that she reported that headaches significantly improved and had no side effects (Exhibit C34F and C39F).

(*Id.*).[9]

He then accounted for limitations imposed by Ramsey's migraines in his RFC determination. (*See* Tr. 1535 ("I have also taken into account safety precautions for possible delayed reaction times due to symptoms and medication side effects, and for possible symptom exacerbating factors such as for migraines and shortness of breath, by including she c[ould] occasionally be exposed to extreme cold, extreme heat, excessive vibration, excessive irritants such as fumes, odors, dust, and gases, poorly ventilated areas, chemicals as defined in the Selected Characteristics of Occupations of the DOT; she could never be exposed to workplace hazards such as moving mechanical parts and high, exposed places.")).

In reaching this determination, the ALJ assessed the record regarding Ramsey's migraines and treatment over the years. *See Watkins v. Comm'r, Soc. Sec. Admin.*, No. 23-

---

[9] While the ALJ cited to a number of medical records recording Ramsey's migraines, the undersigned identified several other exhibits noting her prior medical history of migraines, (*see, e.g.*, Tr. 782, 803, 809, 812, 818, 823, 841, 847, 867, 897, 970, 976, 988, 993, 998, 1008, 1252, 1257, 1260, 1352, 1357, 1361, 1367, 1370, 1375, 1380, 1386, 1387, 1395, 1452, 3057), physicians recording a diagnosis of migraines, (*see, e.g.*, Tr. 780, 786, 790, 794, 810, 813, 819, 824, 843, 848, 868, 895, 898, 900, 930, 946, 972, 977, 1253, 1261, 1365, 1366, 1390, 3059), and Ramsey self-reporting migraine or headache symptoms (*see, e.g.*, Tr. 897, 907, 913, 914, 989, 994, 1009, 1379, 1386, 1454). In addition, during several hospital stays for a variety of conditions, Ramsey's inpatient treatment records include complaints of migraines and treatment administered thereto. (*See* Tr. 787, 791, 794, 894, 902, 912, 1365, 1386).

Nevertheless, the ALJ need not explicitly delineate every potentially relevant medical record. *See Brito v. Comm'r, Soc. Sec. Admin.*, 687 F. App'x 801, 804 (11th Cir. 2017) ("Although [the claimant] points to other evidence in the record that was consistent with her hearing testimony and to which the ALJ did not specifically refer in making her credibility determination, the ALJ was not required to examine or reference every piece of evidence, so long as it is evident, as it is here, that the ALJ considered [her] medical condition as a whole."). Moreover, none of these additional records depict limitations surpassing the information in the records the ALJ cited.

12765, 2025 WL 18514, at *15 (11th Cir. Jan. 2, 2025) ("The Eleventh Circuit has "held that '[t]he ALJ may consider the level or frequency of treatment when evaluating the severity of a claimant's condition." (alteration in original) (quoting *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015))). Substantial evidence supports the ALJ's RFC determination as to Ramsey's migraine impairment.

Other than Ramsey's assertions, the record portrays more focused treatment of her migraines before the timeframe under consideration, September 10, 2017, to February 27, 2020. In particular, Ramsey's primary care physician, Dr. Oguntuyo, referred her to Neurological Specialists, P.C., in 2013 for her migraine ailments. (Tr. 2354). From the initial visit on October 16, 2013, to May 26, 2015, the last visit before the timeframe at issue, treatment notes for four visits consistently reported the following, pertinent observations:

**COMPLAINT**

- Symptoms: The patient complaint of headaches preceded by pins in eyes
- Quality: throbbing and pressure-like
- Severity: severe
- Duration: over ten years ago. 6 hours to 2 days.
- Timing: 5-6/week or daily
- Context: occurs any time
- Syncope[10] once

**REVIEW OF SYSTEMS**

- HEAD/EYES: Patient is positive for blurry vision; eye pain; Patient is otherwise

[10] "Syncope . . . is the broad medical term for fainting or passing out." Cleveland Clinic, *Syncope (Fainting)*, https://my.clevelandclinic.org/health/diseases/17536-syncope (last visited Sept. 30, 2026).

unremarkable. Patient appears otherwise unremarkable.

- GASTROINTESTINAL: Patient is positive for nausea; trouble swallowing; Patient appears otherwise remarkable.
- NEUROLOGIC: Patient is positive for migraines; numbness; dizziness/vertigo; loss of balance; Patient is otherwise unremarkable.

**PHYSICAL EXAMINATION**

- EYES: Fundoscopic Exam:[11] Discs flat; no hemhorrage[12] [sic] or exudates[13] in eye background.
- NEUROLOGIC: Visual fields were full to finger count bilaterally. The pupils were 3 mm with a 2+ reaction to light bilaterally. No Marcus Gunn phenomenon[14] was noted. On funduscopic examination, the discs were flat.[15] Extra-ocular motility[16] was intact.

---

[11] "Fundoscopy is a simple exam where a healthcare provider uses magnifying tools with an attached light to look into [a patient's] eyes. Cleveland Clinic, *Fundoscopy (Ophthalmoscopy)*, https://my.clevelandclinic.org/health/diagnostics/fundoscopy-ophthalmoscopy (last visited Sept. 30, 2026).

[12] "A retinal hemorrhage is the medical term for bleeding in [a patient's] retina. . . . Retinal hemorrhages can be caused by traumas (like getting hit in the head) and health conditions that affect [a patient's] eyes or blood vessels." Cleveland Clinic, *Retinal Hemorrhage*, https://my.clevelandclinic.org/health/diseases/25106-retinal-hemorrhage (last visited Sept. 30, 2026).

[13] "Hard exudates are small, waxy, yellowish-white deposits made up of lipoproteins (fat-carrying proteins) and other lipid material. They accumulate in the outer layers of the retina, which is the light-sensitive tissue at the back of the eye. . . . They are a visible sign that retinal blood vessels have been leaking." Specialty Vision, *Hard Exudates In The Retina: A Patient Guide*, https://specialty.vision/article/hard-exudates/ (last visited Sept. 30, 2026).

[14] "Marcus Gunn pupil means that [a patient's] pupils don't respond in the same way when [a] eye care provider shines a light on them. It's the result of a problem with [a patient's] retina or . . . optic nerve. Usually, pupils exposed to light get smaller (constrict), while pupils faced with less light get bigger (dilate). When both eyes are healthy, they respond in the same way to light. So, if [a] provider shines a light into one eye, both pupils get smaller. If the light is taken away from one eye, both pupils get bigger. Both pupils should respond to light together. If [a patient] ha[s] Marcus Gunn pupil, when light shines into [their] affected eye, both pupils won't constrict as they should." Cleveland Clinic, *Marcus Gunn Pupil*, https://my.clevelandclinic.org/health/symptoms/marcus-gunn-pupil (last visited Sept. 30, 2026).

[15] "[T]he ophthalmoscopic term 'optic disc' has been applied interchangeably to either the whole or a part of the most anterior part of the optic nerve head . . . . [T]he structure usually is not elevated above the level of the adjacent retina but lies flat in the same plane as the retina and has a central depression . . . ." Jost B. Jonas & Sohan Singh Hayreh, *Optic Disc*, *in* ISCHEMIC OPTIC NEUROPATHIES 131, 131 (Springer-Verlag Berlin Heidelberg 2011).

[16] "Extraocular muscle function testing examines the function of the eye muscles. A health care

- Drift was not present. Arm roll was symmetric. Fine motor movements and rapid alternating movements were performed well.
- Tandem gait[17] was within normal limits. Gait was normal.

**ASSESSMENT**

- HEADACHE UNSPECIFIED (PRIMARY)
- SYNCOPE

(Tr. 2354-56 (10/16/13), 2364-66 (2/19/14), 2369-71 (7/16/14), 2373-74 (5/26/15)). The only pertinent deviations recorded no ASSESSMENT of syncope after the 10/16/13 visit, (*see* Tr. 2365-66, 2370, 2374); the 2/19/14 COMPLAINT symptoms recorded "Quality: constant; . . . Duration: years ago. The pain lasts hours. . . . Timing: daily; . . . Other: better w/ [B]otox," (Tr. 2364), and omitted this symptoms list on 7/16/14 and 5/26/15, (Tr. 2369, 2373); and the NEUROLOGIC Physical Examination reported results via a list of seven factors, all of which were normal for the 2/19/14 and 7/16/14 visits, (Tr. 2365, 2370), or reported no such examination for the 5/26/15 visit, (Tr. 2374).

The next treatment notes from Neurological Specialists reflect a 4/15/20 visit, which remarks Ramsey was "previously seen in our office, last visit was in 2015." (Tr.

---

provider observes the movement of the eyes in eight specific directions in addition to straight ahead. . . . This test is performed to evaluate weakness or other problems in the extraocular muscles. These problems may result in double vision or rapid, uncontrolled eye movements." UCSF Health, *Extraocular muscle function testing*, https://www.ucsfhealth.org/care/medical-tests/extraocular-muscle-function-testing (last visited Sept. 30, 2026).

[17] Tandem gait consists of "hell-to-toe walking. . . . It is used as a neurological test of balance and coordination and is useful in identifying subtle or mild gait ataxia . . . ." Oxford Reference, *Tandem gait*, https://www.oxfordreference.com/display/10.1093/oi/authority.20110803102028325 (last visited Sept. 30, 2026).

2376). That visit occurred outside of the timeframe at issue, although the treatment notes records Ramsey suffered a "history of chronic migraines for years," and she reported "severe migraines 2-3 times per week," "milder headaches almost daily," the headaches were "frequently associated with sensitivity to lights and sounds, nausea, dizziness," and more "severe migraines can last up to several days." (*Id.*). Nevertheless, the Review of Systems on that visit depicted pertinently as follows:

- Eye: No blurry vision, No eye pain. No eye discharge. No eye redness. No decrease in vision. No dry eyes. No double vision.
- Gastrointestinal: No nausea. No vomiting. . . . No trouble swallowing.
- Neurologic: No seizures. No tremors. + migraines. No numbness. No dizziness/vertigo, loss of balance . . . .

(*Id.*). The assessment on that day diagnosed a "very longstanding history of chronic intractable common migraine headaches."[18] (*Id.*).

Furthermore, the Neurological Specialists records portray Ramsey may have received migraine relief as care progressed from 2013 to 2015. To be sure, the ALJ erred in determining Neurological Specialists' Botox treatments significantly improved Ramsey's migraine symptoms with no side effects. (Tr. 1531, 1533). The records reflect Ramsey received Botox treatments in the 2013-2015 timeframe. (*See* Tr. 2363

---

[18] "Status migrainosus" describes "a recognized complication[] of migraine . . . defined as a persistent debilitating migraine attack lasting for more than 72h with little reprieve, leading to functional disability." Salwa Kamourieh, Todd Rozen & Jane M. Anderson, *Status Migrainosus*, *in* 199 HANDBOOK OF CLINICAL NEUROLOGY 413, 413 (Jerry W. Swanson & Manjit Matharu eds., Elsevier 2024). "Intractable" migraines denote another name for status migrainosus. *See* ASS'N OF MIGRAINE DISORDERS, *What Is Migraine?: What Are The Different Migraine Types?*, https://www.migrainedisorders.org/migraine-disorders/ (last visited Sept. 30, 2026).

(11/20/13 injection), 2368 (3/25/14 injection), 2369 (7/16/14 follow-up), 2372 (8/21/14 injection), 2375 (5/26/15 follow-up), 2376 (4/15/20 return visit)). And in contrast to the ALJ's remarks, the records indicate the Botox treatments did not provide significant improvement. (*See* Tr. 2369 ("She was due for Botox in June, but missed the appointment. She is unsure if the Botox is helping her or not."), 2375 ("She reported that neither medications that were tried before, nor the Botox injection provided any relief from her headaches."), 2376 ("She was tried on Botox that she feels helped somewhat at one point but she developed some difficulty swallowing and the treatment was not continued."); *but see* 2364 ("better with [B]otox"), 2367 ("Headaches- responded to Botox.")).[19]

Nevertheless, during the 7/16/14 visit Ramsey reported Percocet prescribed by

---

[19] Despite this error, substantial evidence still supports the ALJ's decision as reviewed herein. *See Stacy v. Comm'r, Soc. Sec. Admin.*, 654 F. App'x 1005, 1008 (11th Cir. 2016) ("[S]ubstantial evidence supports the ALJ's decision, despite the misstatements and omissions . . . . [T]he ALJ's misstatements and omissions were harmless because the ALJ considered Stacy's visual limitations as a whole and applied the proper legal standard when assessing his RFC." (citing *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983))). "The ALJ discussed the evidence presented in the medical record[s] . . . . Relying on these, he formulated an RFC that applied the correct legal standard by including all of the limitations supported by the record." *Stacy*, 654 F. App'x at 1008-09 (citation omitted); *see also Bradley ex rel. Bradley v. Kijakazi*, No. 3:21cv681-LC-HTC, 2022 WL 3031229, at *5 (N.D. Fla. July 15, 2022) ("[T]he ALJ's misstatement does not require reversal because the ALJ considered Bradley's condition as a whole and formulated an RFC that was consistent with the evidence . . . ." (citing *Stacy*, 654 F. App'x at 1008-09)), *report and recommendation adopted,* No. 3:21cv681-LC-HTC, 2022 WL 3030533 (N.D. Fla. Aug. 1, 2022); *Jacobus v. Comm'r of Soc. Sec.*, 664 F. App'x 774, 775-776 (11th Cir. 2016) ("[T]he ALJ's statement that Jacobus's diabetes was described as being 'much better controlled' in October 2011 has no support in the medical records from that month. . . . The ALJ's factual errors are harmless, as substantial evidence supports the ALJ's determination . . . . Jacobus has identified no specific medical progress reports that the ALJ failed to address, with the exception of reports documenting his diabetes was uncontrolled. However, these reports do not indicate a worsening of symptoms, but merely show Jacobus's diabetes was never entirely controlled." (citation omitted)).

another Neurological Specialists physician "ease[d]" her pain. (Tr. 2369). Based upon that report, the examining physician prescribed Ramsey Percocet again. (Tr. 2371). At the next visit on 5/26/15, Ramsey declared the "only medication that provided some relief for her was [a] prescription of Percocet," and the practice recommended referral "to a pain management clinic for further treatment of her chronic pain" given that her "chronic intractable headache disorder [was] unresponsive to multiple preventative medication[s] as well as trial of Botox." (Tr. 2375).

The foregoing records also importantly portray Ramsey grappled with her migraines while still gainfully employed. As noted, the Neurological Specialists records reflect treatment from 2013-2015. Indeed, the records document Ramsey complained of headache-related symptoms as far back as at least May 2009. (*See* Tr. 328 (psychological services disability determination evaluation reporting a diagnosis of "Migraine Headaches")).[20] Despite her challenges with migraines, Ramsey maintained gainful employment through August 2017. (*See* Tr. 1902 (noting earnings every year

[20] Ramsey's primary physician, Dr. Oguntuyo, recorded headaches or migraines throughout Ramsey's medical records starting in August 2010 and continuing through the period at issue. (*See, e.g.*, Tr. 2389-90 (8/30/10), 2391-92 (9/27/10), 2393-94 (10/29/10), 2396 (11/24/10), 2403-04 (3/9/11), 2405, 2408-09 (4/15/11), 2521, 2525 (3/4/13), 2527, 2531 (4/1/13), 2533 (4/30/13), 2568-69, 2573 (9/19/13), 2576-77, 2581 (10/17/13), 2583-84, 2588 (11/14/13), 2590-91, 2595 (12/12/13), 2597-98, 2602 (1/9/14), 2604-05, 2609 (2/6/14), 2611-12, 2616 (2/17/14), 2618-19, 2623 (3/6/14), 2625-26, 2630 (4/1/14), 2632-33, 2637 (4/29/14), 2647 (5/29/14), 2649 (6/11/14), 2663 (6/26/14), 2665, 2673 (7/24/14), 2675, 2683 (8/21/14), 2692 (9/18/14), 3002 (10/16/14), 3013 (11/17/14), 3023 (12/15/14), 343 (1/12/15), 353 (2/3/15), 368 (3/3/15), 379 (4/7/15), 396 (6/2/15), 409 (6/30/15), 421 (7/30/15), 433 (8/24/15), 445 (9/21/15), 459 (10/19/15), 475 (11/12/15), 611 (8/30/16), 625 (9/27/16), 638 (10/25/16), 653 (11/22/16), 669 (12/22/16), 684 (1/19/17), 699 (2/16/17), 709 (3/16/17), 515 (8/8/17)). A few other providers also noted Ramsey's migraines in records from visits prior to the time period under consideration. (*See, e.g.*, Tr. 826, 829, 2986, 2989, 2993, 2994).

from 2004 to 2017), 1515 ("The claimant engaged in self-employment . . . in 2017 . . . . The claimant reported that she stopped working in August 2017.")). In such circumstances, the Eleventh Circuit has declined to overturn an ALJ's finding that migraines were not disabling:

> [T]he medical records reveal that Osborn complained of migraine headaches as far back as August 1998, more than three years before he filed for disability. He continued to present symptoms of migraine headaches through 2001, but during this same time continued his employment until his contract expired. In December 2002, Osborn was treated by Dr. Qadir, who diagnosed Osborn with mixed chronic headaches, although no description of either the severity or duration of those headaches was noted. After being referred to Dr. DeRossett, Osborn received treatment that significantly improved his headaches, resulting in DeRossett's letter indicating that, while Osborn might suffer some decrease in physical and mental activities during a headache, his headaches should not be considered disabling. No other medical records relating to headaches appeared in the record.
>
> The only other evidence presented was Osborn's subjective testimony, which indicated that his migraines could occur anywhere from two to eight times a week and could get bad enough that he would have to sit in a dark, quiet area. He testified that these migraines would last anywhere from a couple of hours to a couple of days, and sometimes they required an injection. None of the medical records, however, indicate that Osborn received injections for his migraines, nor did they reflect the level of severity to which Osborn testified. However, in spite of the pain from his migraines, Osborn was able to take care of himself and managed to work from at least 1998 (the first medical complaint of migraines) until September 2001. He also managed to work for friends and other employers on temporary contract jobs in 2001, 2002, and 2003. Moreover, Osborn, on a typical day, was capable of waking up, cooking breakfast, helping the kids "get out the door" and driving them to school, checking e-mail, attending to appointments, and taking care of the household.
>
> Finally, Osborn briefly alludes to the psychological evaluation completed by Michelle Martin, Ph.D., on June 11, 2003, and argues that

> the ALJ ignored Martin's conclusion that Osborn was not overstating his symptoms or exaggerating his pain. However, Martin's report notes that Osborn has had severe headaches his entire life, severe migraines for the past 10 years, and daily migraines at the time of his evaluation. While Osborn may have been sincere, it does not appear that he described his symptoms to Martin. Furthermore, Osborn's own statements are contradicted by medical records from April 24, 2003, and June 4, 2003, where Osborn reportedly had a "50% improvement in his headaches and only 4–5 'bad headaches'" and had indicated that his migraines were "much better," respectively.
>
> In any event, Osborn also told Martin that he had suffered from migraines for the last ten years and severe headaches his entire life. *Taking Osborn's statement as true, he suffered from migraine headaches since 1993, but was gainfully employed from 1993 until 2001 as, among other things, an electrician, construction worker, and information technologies worker. In short, the ALJ's finding that Osborn's migraines were not disabling was supported by substantial evidence.*

*Osborn v. Barnhart*, 194 F. App'x 654, 662-63 (11th Cir. 2006) (emphasis added); *see also Binder v. Comm'r of Soc. Sec.*, No. 3:17-CV-1024-J-PDB, 2019 WL 1397923, at *10 (M.D. Fla. Mar. 28, 2019) ("The ALJ asked Binder about her work history during the hearing, . . . and relied on her ability to work for many years despite lifelong headaches as a factor in discounting the frequency and intensity of her headaches . . . . The ALJ could have but did not have to weigh Binder's work history favorably to her. It is not the Court's place to reweigh the evidence here.") (citations omitted).

After the foregoing pre-onset period, the record contains reports the ALJ reviewed of Ramsey's visits to her primary care physician, Dr. Oguntuyo, "before and after the alleged onset date and through February 27, 2020." (Tr. 1530). These records contained "[p]rogress notes through the years show[ing] routine visits for management of medically determinable impairments such as medication refills, laboratory blood

work and other diagnostic test[s], preventative care, symptom exacerbations, and referrals." (Tr. 1530).

Specifically relating to Ramsey's migraines, Dr. Oguntuyo's records consistently contain the same three notations. First, he notes "Musculoskeletal: Headache . . . Neurological: dizziness." (Tr. 517 (9/7/17), 530 (10/10/17), 543 (11/9/17), 571 (12/7/17), 578 (1/2/18), 588 (2/5/18), 1236 (3/5/18), 723, 1220 (3/19/18), 739, 1204 (4/3/18), 754, 1188 (4/26/18), 1172 (6/28/18), 1156 (7/26/18), 1140 (8/23/18), 1124 (9/20/18), 1108 (10/18/18), 1092 (11/15/18), 1076 (12/13/18), 1060 (1/10/19), 1044 (2/7/19), 1028 (3/7/19), 1012 (4/4/19), 1266 (5/2/19), 1282 (6/3/19), 1298 (7/1/19), 3025 (7/29/19), 1314 (8/26/19), 1330 (10/21/19), 1473 (12/16/19), 1457 (1/13/20), 3041 (2/10/20), 2703 (2/24/20)). Then, in all but one instance, Dr. Oguntuyo denotes as follows in the concluding summary of the same notes: "Musculoskeletal: Headache . . . n/a." (Tr. 527 (9/7/17), 540 (10/10/17), 554 (11/9/17), 585 (1/2/18), 598 (2/5/18), 720, 1249 (3/5/18), 736, 1233 (3/19/18), 751, 1217 (4/3/18), 764, 1201 (4/26/18), 1185 (6/28/18), 1170 (7/26/18), 1154 (8/23/18), 1138 (9/20/18), 1121 (10/18/18), 1105 (11/15/18), 1090 (12/13/18), 1073 (1/10/19), 1057 (2/7/19), 1041 (3/7/19), 1026 (4/4/19), 1280 (5/2/19), 1295 (6/3/19), 1312 (7/1/19), 3038 (7/29/19), 1328 (8/26/19), 1344 (10/21/19), 1487 (12/16/19), 1471 (1/13/20), 3054 (2/10/20), 2717 (2/24/20)). Finally, in a number of the records from these visits, Dr. Oguntuyo lists in

the assessment section, "[m]igraine w/o aura, intractable, without status migrainosus."[21] (Tr. 528 (9/7/17), 541 (10/10/17), 555 (11/9/17), 576 (12/7/17), 586 (1/2/18), 599 (2/5/18), 721, 1250 (3/5/18), 737, 1234 (3/19/18), 752, 1218 (4/3/18), 765, 1202 (4/26/18), 1186 (6/28/18), 1170 (7/26/18), 1154 (8/23/18), 1138 (9/20/18), 1122 (10/18/18), 1106 (11/15/18), 1090 (12/13/18), 1074 (1/10/19), 1058 (2/7/19), 1042 (3/7/19), 1026 (4/4/19), 1280 (5/2/19)).[22] In reviewing the foregoing records, the ALJ "note[d] that Dr. Oguntuyo restated reported symptoms with the physical examination findings . . . , but usually noted 'n/a' next to them which is an abbreviation that is generally known as not applicable." (Tr. 1530-31).

The ALJ also reviewed Ramsey's daily activities, noting Ramsey "was able to manage her personal care, prepare simple meals, drive or ride in a car, shop in stores once a month for several hours, follow written instructions, manage finances . . . , handle changes in routine, and go places without needing reminders or someone to accompany her." (Tr. 1534). He also considered Ramsey's testimony from the 2020 hearing, where she stated "she was able to do some cooking, prepare a snack or sandwich, drive, use a cell phone, read, and write." (*Id.*). He found these abilities "further diminish[ed] the persuasiveness of [Ramsey's] allegations." Rather, "[t]hese

---

[21] "Aura" refers to "visual, sensory or motor disturbances" which occur "just before a migraine attack." Cleveland Clinic, *Migraine Aura*, https://my.clevelandclinic.org/health/diseases/22131-migraine-aura (last visited Sept. 30, 2026).

[22] Dr. Oguntuyo does not include this third notation in the assessment section of the records for visits between June 2019 and February 2020. (*See* Tr. 1296 (6/3/19), 1312 (7/1/19), 3039 (7/29/19), 1328 (8/26/19), 1344 (10/21/19), 1487 (12/16/19), 1471 (1/13/20), 3055 (2/10/20), 2717 (2/24/20)).

activities of daily living [were] consistent with the ability to perform a range of sedentary work and are directly contradictory to the claimant's allegation that she was unable to work in any capacity." (*Id.*); *see also* 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i) (permitting an ALJ to consider a claimant's daily activities when assessing their report of subjective symptoms vis-à-vis their ability to work).[23]

The ALJ further noted the relevant examination findings before and during the period under consideration "remained entirely normal." (Tr. 1531, 1533). "Specifically, her cranial nerve function, eye movements, balance, gait, memory, cognition, and attention . . . all remained unaffected." (Tr. 1531; *see also* Tr. 1536 ("The record, however, shows that she was evaluated for migraines with negative workup such as imaging studies of the brain and EEG . . . ."), 2223 (reporting an MRI with and without contrast on 10/30/13 revealing sinusitis, a small sinus polyp, and otherwise normal results), 2362 (documenting "a normal awake and asleep EEG" recorded on 10/24/13), 2993-94 (detailing a normal neurologic exam conducted on 8/3/17), 1435 (describing an unremarkable MRI of the brain Ramsey underwent on 6/28/19)).[24]

---

[23] Relying on these activities alone does not constitute a sufficient basis to discount Ramsey's descriptions of her migraine symptoms. *See Valerie G. v. Saul*, No. 1:19-cv-02705-AJB, 2020 WL 13543879, at *8 (N.D. Ga. Aug. 26, 2020) ("[T]he undersigned agrees that it was improper for the ALJ [to] rely on Plaintiff's activities as a basis for discounting evidence of her migraine pain without explaining why the reported activities would be incompatible with her allegations of intermittent debilitating pain."). Nevertheless, this "does not mean it is improper for the ALJ to consider a claimant's daily activities at all." *May v. Comm'r of Soc. Sec. Admin.*, 226 F. App'x 955, 959 (11th Cir. 2007) (citing 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i)).

[24] To be sure, the lack of objective clinical evidence of migraines does not conclusively discredit Ramsey's migraine allegations.

Finally, the ALJ deemed the physical RFC assessment completed by Robert Heilpern, M.D., on October 18, 2018, mostly persuasive. (Tr. 1535). This assessment did not include any notations of absenteeism resulting from migraine headaches. (Tr. 85-88). Rather, the limitations Dr. Heilpern imposed attributable to Ramsey's migraines consisted of avoiding concentrated exposure to extreme cold and vibrations and avoiding all exposure to unprotected heights and hazardous moving parts. (Tr. 87-88). The ALJ included all of these recommendations, along with more restrictive limitations, in his RFC determination. (*See* Tr. 1526).

---

> There are no medical tests to prove the existence of a migraine headache . . . ; rather, migraines are diagnosed based on medical history, symptoms, and physical and neurological examination, and tests such as CT scans are used not to make a positive diagnosis but instead are used to rule out other causes for pain. Mayo Clinic, *Migraine Diagnosis*, https://www.mayoclinic.org/diseases-conditions/migraine-headache/diagnosis-treatment/drc-20360207 (last visited 8/26/2020); Abraham J. Nagy, M.D., Am. Migraine Found., *Do I Need an Imaging Study for My Headache?*, https://americanmigrainefoundation.org/resource-library/need-imaging-study-headache (last visited 8/26/2020) (Because "[m]igraine is caused by a complicated interaction between the brain and blood vessels in the head[,] . . . for most people, an imaging study will not show anything and will look like the scan of someone who does not have [a] headache."). Thus, myriad courts have held that migraine headaches need not be proven through objective clinical tests and that a physician may instead rely on physical manifestations of pain; emergency-room records or other treatment notes reflecting medical signs and symptoms, such as pain, nausea, blurred vision, aura, photophobia, phonophobia, or flashes of light; and records of treatment with medication that is typically used to treat migraine headaches. *Tyler v. Saul*, Civ. Action No. H-18-3329, 2020 WL 3549684, at *8 (S.D. Tex. Mar. 2, 2020) (collecting cases); *Teresa P. v. Saul*, Case No. 19cv1321-CAB(RBB), 2020 WL 951148, at *6 (S.D. Cal. Feb. 27, 2020); *Smith v. Saul*, 413 F. Supp. 3d 1140, 1148-49 (N.D. Ala. 2019) (collecting cases); *Ortega v. Chater*, 933 F. Supp. 1071, 1075-76 (S.D. Fla. 1996); *cf. Vega v. Comm'r of Soc. Sec.*, 265 F.3d 1214, 1219-20 (11th Cir. 2001) (holding that because there is no test for chronic fatigue syndrome ("CFS"), it was improper for the ALJ to fail to credit the plaintiff's subjective complaints of fatigue, poor concentration, and memory difficulties or to evaluate the symptoms on her ability to work).

*Valerie G.*, 2020 WL 13543879, at *9.

Kayla does not point to any records or medical opinions the ALJ failed to consider to support her contention the ALJ should have included further limitations in the RFC regarding the effects of Ramsey's migraines. (Doc. 14 at 26-31). In fact, as noted previously, and as Kayla recognizes in her brief, Ramsey's neurologist's records do not contain any evidence Ramsey visited or received treatment during the period under consideration. (*Id.* at 28 ("[T]he exhibit cited by the ALJ, Exhibit C39F does not include records from the time period considered by the ALJ. . . . Instead it includes records from 2013 to 2015, then there is a 5-year gap, which picks up again in April 2020 – after the time period examined by the ALJ.")).

Based upon the foregoing review, substantial evidence supports the ALJ's RFC assessment vis-à-vis Ramsey's migraine impairment. In particular, the ALJ utilized the restrictions recommended by Dr. Heilpern for Ramsey's migraine impairment, who notably did not couch his recommendation as only preventing the exacerbation of migraines.

The ALJ's ultimate determination regarding the limitations imposed by Ramsey's migraines "enable[s] . . . the court to conclude that [the ALJ] considered [Ramsey's] medical condition as a whole." *Parten*, 2025 WL 2810008, at *9 (quoting *Dyer*, 395 F.3d at 1210). While Kayla disagrees with the ALJ's interpretation of the evidence, the totality of the medical and other record evidence provides substantial evidentiary support for the ALJ's RFC finding. *See Winschel*, 631 F.3d at 1178 (holding the court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment'" for

that of the ALJ); *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011) ("The question is not . . . whether [the] ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it.").

### III. The ALJ Properly Relied on the Vocational Expert ("VE")'s Testimony as Substantial Evidence Supporting the Finding There Existed a Significant Number of Jobs in the National Economy Ramsey Could Perform.

Kayla contends "[t]he VE's testimony as to the number of jobs in the national economy [wa]s clearly wrong, not substantial evidence, and fail[ed] to meet the [Commissioner's] burden at Step Five." (Doc. 14 at 31). She asserts "[t]he VE's testimony as to the number of envelop[e] addresser jobs cannot be correct." (*Id.*). She further argues "while the VE's testimony as to the number of lens inserter and eyeglass frame polisher jobs is not impossible, it is so unlikely and contradicted by reliable, publicly available data, that the [Commissioner's] job numbers are not supported by substantial evidence." (*Id.* at 32).

At step five, the burden shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *See* 20 C.F.R. § 404.1520(a)(4)(v); *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). For a vocational expert's testimony to constitute substantial evidence, the ALJ must present a hypothetical question that "comprises all of the claimant's impairments." *Wilson*, 284 F.3d at 1227. The claimant must refute the Commissioner's findings that the claimant can perform other work by proving he or

she cannot perform the suggested jobs. *Williams v. Barnhart*, 140 F. App'x 932, 937 (11th Cir. 2005); *Long v. Shalala*, 902 F. Supp. 1544, 1546 (M.D. Fla. 1995) (citing *Hale*, 831 F.2d at 1011).

In *Goode v. Commissioner of Social Security*, the Eleventh Circuit detailed the process of deciphering the data reporting the number of jobs that exist in the national economy for any given occupation:

> Work which "exists in the national economy" means "work which exists in significant numbers either in the region where [the] individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). *See also* 20 C.F.R. § 416.966(a) (same). The Social Security Administration, however, "does not tally the number of job openings at a given time, but rather approximates the number of positions that exist, whether vacant or filled, and without regard to the location of the work and a claimant's likelihood of being hired." *Chavez v. Berryhill*, 895 F.3d 962, 964 (7th Cir. 2018). ALJs may therefore use vocational experts and other specialists to assist with step five determinations. *See* 20 C.F.R. § 416.966(e). *See also Washington*, 906 F.3d at 1360 ("Put simply, the critical inquiry at step five is whether jobs exist in the national economy in significant numbers that the claimant could perform in spite of his impairments, and the ALJ can consider both jobs data drawn from the DOT as well as from the testimony of the [vocational expert] in making this determination.").
>
> To obtain a job-numbers estimate, a vocational expert may consult a publication like the DOT. *See* 20 C.F.R. § 416.966(d)(1). The DOT groups jobs into "occupations" based on their similarities and assigns each occupation a code number. Unfortunately, the Department of Labor has not revised the DOT since 1991. Although the DOT is outdated—some would say obsolete—it remains one of the vocational expert's primary tools. *See Chavez*, 895 F.3d at 964-65 (discussing the shortcomings of the DOT and noting an upcoming system that aims to replace it in 2020); *Purdy v. Berryhill*, 887 F.3d 7, 14 n.10 (1st Cir. 2018) (same).
>
> Aside from being three decades old, the DOT presents other difficulties. DOT codes, for example, do not provide statistical information about the number of jobs available in the national economy.

> Instead, the vocational expert must look to other sources like the Occupational Employment Quarterly (OEQ), which is compiled by a private organization called U.S. Publishing, to find employment statistics. *See Herrmann v. Colvin*, 772 F.3d 1110, 1113 (7th Cir. 2014); *Brault v. Soc. Sec. Adm.*, 683 F.3d 443, 446 (2d Cir. 2012). The OEQ database, however, does not compile data by DOT codes, but rather through the Standard Occupational Classification (SOC) system. *See Brault*, 683 F.3d at 446; Occupational Employment Statistics, Bureau of Labor Statistics, https://www.bls.gov/oes/ (last visited April 30, 2020).
>
> The SOC system groups together detailed occupations with similar job duties. As a result, a single SOC group may contain multiple DOT occupations. *See Herrmann*, 772 F.3d at 1113–14. In the words of the Seventh Circuit, "[t]he use of one system to supply the job titles and another [system] to provide the number of jobs creates a matching problem: a one-to-one correlation does not exist." *Chavez*, 895 F.3d at 965. *See also Brault*, 683 F.3d at 447 n.4 (noting the "information loss" that results from the "many-to-one mapping" between the DOT and SOC codes, and explaining that any estimate of existing jobs "may deviate significantly from the actual number of existing positions"). To provide some assistance in this regard, the Bureau of Labor Statistics has published a crosswalk which provides the corresponding SOC group code for each DOT occupation. *See* DOT Crosswalk Search, O*NET OnLine, https://www.onetonline.org/crosswalk/DOT/ (last visited April 30, 2020).

*Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1280-81 (11th Cir. 2020) (alterations in original).

Kayla presents evidence from the DOT Crosswalk on O*NET OnLine, as well as occupational employment statistics, to contend substantial evidence does not support the VE's testimony. (Doc. 14 at 33-35). Citing to SOC codes and information from JobBrowser Pro reports, Kayla asserts the VE's testimony must contain substantial inaccuracies. (*See id.* at 33-36). However, the court's "review of the ALJ's decision is limited." *Valdez v. Comm'r of Soc. Sec.*, 808 F. App'x 1005, 1009 (11th Cir. 2020). The

court may only consider "the evidence actually presented to the ALJ." *Id.* at 1010 (quoting *Falge*, 150 F.3d at 1323).

Ramsey did not "present the occupational employment statistics before the ALJ or object to the vocational expert's testimony. In fact, [s]he stipulated that the vocational expert was qualified to testify." *Id.*; (*see also* Tr. 1584). *Compare Webster v. Comm'r of Soc. Sec.*, 773 F. App'x 553, 555 (11th Cir. 2019) ("[D]uring the hearing, Webster did not question the VE's qualifications and the questions that he posed to the VE did not address his present concerns about the reliability of the VE's testimony."); *Bacon v. Comm'r of Soc. Sec.*, 861 F. App'x 315, 320 (11th Cir. 2021) ("Bacon did not present such evidence before the ALJ, nor did he object to the VE's testimony or inquire further into her methodology."); *and Ford v. Kijakazi*, No. CA 20-0457-MU, 2022 WL 363314, at *7 (S.D. Ala. Feb. 7, 2022) (finding the claimant did not "in any manner address her present concerns about the reliability of the VE's testimony based upon the purported non-existence of the three jobs identified by the VE during the hearing."); *with Goode*, 966 F.3d at 1284 n.3 ("This is not a case in which the claimant failed to challenge or question the vocational expert's methodology or job numbers."); *Biestek*, 587 U.S. at 104-05 (considering only cases in which the claimant demanded the VE's supporting data).

"As a result, [the court is] foreclosed from considering the data in the occupational employment statistics on appeal." *Valdez*, 808 F. App'x at 1010; *see also Bacon*, 861 F. App'x at 320 ("[W]e must look only to the evidence that was presented to

the ALJ, and not evidence that was subsequently presented to the district court . . . ."); *Franklin v. Kijakazi*, No. 1:21-cv-86-CWB, 2023 WL 5735239, at *11 (M.D. Ala. Sept. 5, 2023) ("Because the VE's testimony is the only evidence regarding the number of jobs available in the record, the court is foreclosed from considering other evidence presented to it by Plaintiff."); *Ford*, 2022 WL 363314, at *7 ("[T]he Commissioner's regulations allow the agency to take notice of the DOT but [m]akes no mention of the O*Net or any of the other publications specifically referenced by the Plaintiff in her brief . . . . Accordingly, the undersigned discerns no error in the ALJ in this case relying on the DOT, which she is required to consider in conjunction with the VE's testimony . . . , as opposed to sources which are not mentioned in the regulations as containing reliable data . . . , particularly, where, as here, this other vocational information was not discussed with the ALJ or VE during the hearing." (citations and footnote omitted)).

The only evidence presented to the ALJ regarding the number of envelope addresser, lens inserter, and eyeglass frame polisher jobs available consisted of the VE's testimony indicating these three occupations accounted for 342,000 jobs in the national economy. (*See* Tr. 1587-88). The Supreme Court has explained courts must assess VE testimony on a case-by-case basis, but such expert testimony, assuming no demand from the claimant, "may count as substantial evidence even when unaccompanied by supporting data." *Biestek*, 587 U.S. at 105-06, 108; *cf. Webster*, 773 F. App'x at 555-56 ("[T]o the extent that Webster argues that the ALJ was required to independently verify a VE's testimony, we have held that the ALJ is only required to do so when there is a

conflict between the VE's testimony and the DOT. . . . [T]his Court has not placed an affirmative duty on the ALJ to independently investigate a conflict between the VE's testimony and job availability figures provided by the Bureau of Labor Statistics in the [Occupational Employment Statistics ('OES')].").

The VE's undisputed testimony in this case, which drew from her knowledge, experience, and training, represents evidence "neither clearly and unmistakably wrong on its face, nor . . . internally inconsistent and incomplete." *Bacon*, 861 F. App'x at 320. Therefore, it constitutes substantial evidence to support the ALJ's step-five determination. *See Ford*, 2022 WL 363314, at *8 ("In light of the foregoing and because a reasonable person would accept the VE's testimony—which was based on her own knowledge, experience, and training, as well as the DOT—as being adequate to support a conclusion that Ford is able to perform other work that exists in the national economy, the ALJ's fifth-step determination is supported by substantial evidence and is, therefore, affirmed."); *Webster*, 773 F. App'x at 555 ("The VE's testimony—based on his own experience of having completed supervisor surveys for the specific jobs for which he found Webster qualified, his knowledge of the industry, and the Dictionary of Occupational Titles ('DOT')—constituted 'substantial evidence' that there were a significant number of jobs that existed in the national economy that Webster could perform."); *Valdez*, 808 F. App'x at 1010; *Bacon*, 861 F. App'x at 320-21; *Franklin*, 2023 WL 5735239, at *11-12.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision. The court will enter a separate final judgment.

**DONE** this 30th day of September, 2026.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE